LAKELANDS, INC., Respondent, vs. CHIPPEWA & FLAMBEAU IMPROVEMENT COMPANY, Appellant.

*September 11, 1940—April 15, 1941.*

For the appellant there were briefs by *Ramsdell, King & Linderman* of Eau Claire, and oral argument by *Bailey Ramsdell* and *George Y. King.*

For the respondent there were briefs by *Hammond & Jones* of Kenosha, and oral argument by *Walter W. Hammond* and *Ernest E. Jones.*

The following opinion was filed January 7, 1941:

FOWLER, J.  As appears from the foregoing statement the action is to recover damages for breaches of the covenants of seisin and for quiet enjoyment and title contained in a warranty deed in ordinary form executed and delivered by defendant to plaintiff in 1926, which are alleged to have resulted from a resurvey and replatting by the United States government of the land described in the deed subsequent to its execution and the awarding of the greater part of the land to others than the plaintiff.

In a suit for breach of a covenant of warranty of title, the defendant may defend on the proposition that his title was good under the facts existing at the time he executed the covenant; *McInnis v. Lyman,* 62 Wis. 191, 196, 22 N. W. 405; 15 C. J. p. 1239, and cases cited in note 25; and on the proposition that the plaintiff yielded to an inferior title; 15 C. J. p. 1297, and cases cited in note 59.  The instant case involves alleged breaches of covenants of warranty of title to the two parcels of land bordering on a lake designated as lot 7 and lot 4.  We are of opinion that under the propositions above stated, the defendant has established a defense as to lot 4 and a partial defense as to lot 7, as hereinafter indicated, and that the plaintiff yielded to an inferior title.

The plaintiff bases its right to recover on the proposition that the allotment of the United States government pursuant to the proceedings instituted by Ilg for resurvey and replatting of the land bordering on the lake gave good and paramount title to the allottees.  This would doubtless be correct if the title so passed were established by the judgment of a court of competent jurisdiction.  But no such result follows from a determination of the land department of the United States government, or from a resurvey by such department, or from patents issued pursuant to such a resurvey.  When a second patent is issued pursuant to a resurvey covering land covered by a prior patent based on the original government survey, the question which patent conveyed the title to the land covered

by the later patent must be determined by the judgment of a court of competent jurisdiction. There never has been such a determination by any court respecting the instant patent. The trial court did not determine that question. It assumed that the proceedings before the land department determined that question and that the patents issued pursuant to those proceedings conveyed a title superior to the title conveyed by the deed in suit. This appears from the opinion of the trial court contained in the record wherein it is said: "The resurvey took away from the plaintiff all of lots 13 to 17, inclusive, from the lands the defendant had warranted to it in lots 4 and 7." This also appears from the findings of the court wherein it is said: "That by the decision of the general land office of the United States it was held and determined that said lots 13, 14, 15, 16, and 17 [of the resurvey] were unplatted land [and] had never been conveyed by the United States."

That the United States land department cannot determine the question of title here involved is plain. In *Moore v. Robbins,* 96 U. S. 530, 24 L. Ed. 848, decided in 1878, Mr. Justice MILLER wrote the opinion and wrote the headnotes thereto. Headnote 1 is to the effect that a patent from the United States government carries with it the legal title to the land, and with the patent all control of the land department of the government. Headnote 2 declares that if any lawful reason exists why the patent should be canceled the appropriate *and only* remedy is by a bill in chancery in a court of competent jurisdiction, and there exists no power in the land department of the government to reconsider the facts on which the patent was based or rescind it or to issue another patent for the same land. There was no dissent. We take it, both from reading the opinion and because the headnotes were written by the justice who wrote the opinion, that the notes express precisely what the court decided. In Rose's Notes to the case we find a multitude of cases following the rule of the leading case, in a multitude of situations. One of the Rose's Notes is headed

"Patent is highest evidence of title, and is conclusive against government and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal." In 10 Michie, Encyc. of U. S. Rep. p. 247, we find it stated: "A patent regularly issued is conclusive as against the government and junior claimants, unless set aside or annulled by some authorized judicial tribunal, unless otherwise specifically provided by statute." The only statute we find relating to resurveys of lands that touches the matter expressly provides that "no such resurvey . . . shall be so executed as to impair the *bona fide* rights or claims of any claimant, entryman, or owner of lands affected by such resurvey." 35 U. S. Stats. at L. 845, 36 U. S. Stats. at L. 884, 43 USCA, § 772. We fail to see why this provision does not apply to the instant plaintiff as the owner of lots 7 and 4, and prevent the department from attempting to take from the plaintiff the land it claimed to own, in view of the fact that only fifty-three acres is involved in the whole resurvey and only twenty-eight acres in the land assumed to be taken from plaintiff by the replatting. The statement in *Mitchell v. Smale,* 140 U. S. 406, 412, 11 Sup. Ct. 819, 35 L. Ed. 442, is particularly applicable here:

"We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be. It is nothing more nor less than taking from the first grantee a most valuable, and often the most valuable part of his grant."

It is said of resurveys in *Kean v. Calumet Canal & Improvement Co.* 190 U. S. 452, 461, 23 Sup. Ct. 651, 47 L. Ed. 1134: "The resurvey by the United States in 1874 does not affect the Calumet company's rights. As the United States already had conveyed the lands, it had no jurisdiction to intermeddle with them in the form of a second survey." Citing cases. And in *United States v. State Investment Co.* 264 U. S. 206, 212, 44 Sup. Ct. 289, 68 L. Ed. 639, it is said: "A resurvey by

the United States after the issuance of a patent does not affect the rights of the patentee; the government, after conveyance of the lands, having no 'jurisdiction to intermeddle with them in the form of a second survey.' "

That the determination of the superiority of the titles here involved is a judicial question, not determinable by the government land department but solely by the courts, is held in *Brothertown Realty Corp. v. Reedal,* 200 Wis. 465, 227 N. W. 390.

We are not unmindful of the contention of the plaintiff that the rule above stated does not apply when the acreage of land between the true line of the lake shore and the meander line is so great as to constitute a fraud upon the government. That rule is stated in the *Reedal Case, supra,* p. 469, to be:

"That where the original survey line departs so far from the true meander line of a body of water as to leave so large a tract of land unsurveyed as to clearly indicate that the meander line was in fact never run, then the survey will be held invalid as a constructive fraud upon the government."

But the question whether the acreage is so great as to constitute a constructive fraud is a judicial question not determinable by the United States government land department. Fraud, whether actual or constructive, is always a judicial question. In the *Reedal Case, supra,* that the acreage was so great as to constitute a fraud was determined contrary to the decision of the circuit court. Here, where the circuit court made no finding covering the point, it is more clearly determinable by this court. As above stated, only fifty-three acres are involved in the whole survey. Only three acres are involved in lot 4, and twenty-five in lot 7. In the *Reedal Case* one hundred three acres were involved. That seems to be the low limit. In *Brown v. Dunn,* 135 Wis. 374, 115 N. W. 1097, nearly one hundred twenty acres were included between the meander line of a lake as shown on the government plat and the true line of the lake shore. But the rule was applied that the title of the

government to all this land passed by the patent to the lot, shown on the plat as containing to the meander line a little less than forty acres. In that case there was no resurvey or re-platting, but the fact remains that it was held that the title to the land between the meander and the true line passed. It is said in the opinion (p. 378) :

"Nor can we, as courts have done in some cases, assume either fraud in the survey or so gross a mistake in the location of the lake as to force the conclusion that the United States government did not, under the rule above stated, intend to con-vey to its shore, for the reason that no such body of water as indicated [on the map] existed to serve as a natural monument or boundary."

The low limit of the tracts involved in the United States supreme court cases, so far as we can find, in which later patents were held to override patents issued on the original survey, is one hundred fifty-eight acres. This was held in *French-Glenn Live Stock Co. v. Springer,* 185 U. S. 47, 54, 22 Sup. Ct. 563, 46 L. Ed. 800, where the government plat showed a meander line around a lake as comprising that acreage, but the survey was made at time of flood water and there was in fact no lake at all. The closing paragraph of the opinion states that while if there had been any lake at all the patent involved would have taken all the land within the mean-dered line and the water and all its accretions "it was competent for the defendant to show that there was not, at the time of the survey nor since, any such lake, and to contend that, in such a state of facts, there could be no intervening land and no accretion by reliction."

It is to be borne in mind that what the defendant conveyed to the plaintiff by the warranty deed in suit was government lots 4 and 7 in the government section designated in the deed. That is what the deed purports to convey and that is what it did convey. There is no ambiguity in that deed. Subsequent surveys cannot be introduced as independent evidence to

change that deed or the boundaries of the land comprised in the lots included in it. *United States v. State Investment Co., supra.* A surveyor may, of course, be produced as a witness, testify as to his survey and produce his plat. But what the lots comprised is shown by the original government plat of the section, the surveyor's notes accompanying the plat, and the rules of law that govern the interpretation of such plats and notes. Where, as here, meander lines are shown on the plat of a section containing land bordering on a lake the rules are that meander lines are not boundaries, but are put in to indicate the proximate acreage of the lots shown on the plat, and the land contained in such lots is the land bounded by the government lines shown on the plat and the actual lake shore where it is intersected by those lines. *Brown v. Dunn,* 135 Wis. 374, 115 N. W. 1097.

Lot 7 is shown on the plat to be bounded by three government lines; on the west by the north and south quarter line of the section; on the south by the south section line; and on the east by the north and southeast eighth line. By later surveys the lake now extends south of the south section line for the greater part of the distance between the north and south quarter line and the north and southeast eighth line. The present location of the south shore line was doubtless caused by the raising of the lake level five feet by the construction of a dam at its outlet since the original survey was made, and the fact that the land on the south shore of the lake was low. This made the boundary of the lot the north and south quarter line and the east north and south eighth line and the lake shore where it is intersected on the north by the north and south quarter line and on the south by the south section line. This was adjudged by the circuit court of Vilas county in the Ilg suit to include the land covered by replatted lots 13 and 17 as shown on the plat attached to the plaintiff's complaint. There was no appeal from that judgment. That judgment was an express adjudication of the title to the land

comprised in lot 7. The judgment was rendered in an eject-ment suit, wherein the plaintiff herein was plaintiff and Ilg was defendant. The plaintiff therein had to stand on the strength of its title. Ilg might have relied in that case on the point that the plaintiff had no title because the meander line of the original plat was so far distant from the true shore line of the lake as to make inclusion of the land within it a fraud on the government and render void the original patent to lot 7, but he did not do so. He pleaded by his answer and contended that by that plat the land there in dispute was a part of lot 5 of the original plat, to which he had a patent. The judgment in that case was *res judicata* between the parties, both as to what was litigated and as to what might have been litigated therein. Therefore, the title to lot 7 was established by the judgment of the court as it existed at the time of the execution of the deed of defendant to plaintiff. True, the United States gov-ernment was not a party to that suit and was not bound by that judgment, but it could not by a mere act of its land department override and destroy a title so established and so existing. And we hold that upon the competent evidence in the record before us the trial court, regardless of the former judgment, could arrive at no other conclusion than that there was no fraud, constructive or otherwise, in the original survey as shown by the government plat and accompanying notes, and that there was no breach by the defendant of its warranty by reason of the subsequent resurvey of lot 7.

Lot 4 was not involved in the Ilg suit. The area of lot 4 as defined by the government subdivisional lines and the present lake shore is about 20 acres. As shown on the original plat it is designated as 30.55 acres. The government was certainly not defrauded in issuing its first patent by receiving pay for 30.55 acres of land as shown on the original plat if there was in fact only 20 acres between the lake shore and government lines shown on that plat. In lot 4 the adjusted meander line and the true line of the shore are less than four hundred feet

apart at their greatest divergence and the distance between them ranges from this to nothing where the two lines cross. The greatest divergence between the two lines anywhere in the section is not over nine hundred feet. This, under *Brown v. Dunn, supra,* is not such a departure as to show such gross mistake as to constitute constructive fraud and it would seem that the title of the original lot 4 was clearly enough in the plaintiff herein, unless the whole original survey were held fraudulent. But even where such is the situation, the title to separate parcels designated in the original plat as marked by divisional lines and the meander line is good where there is no such gross departure in the plats of those parcels as to constitute constructive fraud. Thus, in an original survey involved in *United States v. Lane,* 260 U. S. 662, 43 Sup. Ct. 236, 67 L. Ed. 448, which had been held invalid, *Jeems Bayou Club v. United States,* 260 U. S. 561, 43 Sup. Ct. 205, 67 L. Ed. 402, and *Producers Oil Co. v. Hanzen,* 238 U. S. 325, 35 Sup. Ct. 755, 59 L. Ed. 1330, which involved a survey including an excess of 500 acres, patents to certain platted parcels in the same survey involving excesses of 5.67 in a 26-acre tract, 12.72 in a 23-acre tract, 27.87 acres in a 155-acre tract, 11.49 acres in a 114-acre tract, and 97.64 acres in two other tracts aggregating 271 acres were held to pass valid title. As in lot 4 the greatest divergence between the relocated meander line and the lake shore is less than four hundred feet and the average divergence is not much over one hundred feet, we hold that lot 4 contained in the deed between the parties hereto conveyed the land between the government lines shown on the original plat and the existing lake shore. Upon the evidence we therefore hold that at the time the deed was executed on which the plaintiff bases its suit the title to both lots 7 and 4 was in the defendant and there was no breach of the defendant's warranty.

Before leaving the subject of the superiority of the titles passed by the patents involved let us consider just what the

United States land department attempted to do by its survey and allotment of the land bordering on the lake. The report of the government surveyor sent to investigate whether the Ilg application for a resurvey should be granted recites that Ilg had a summer resort on the shore of the lake with extensive improvements; that extensive improvements had been made on lands in lots 4, 5, 6, and 7 of the original plat which had been omitted on the original survey and the area between the meander line noted in connection with the original survey and the area between that line and the lake should be reclaimed by the government and surveyed as public land; "relief could then be afforded by applicants [Ilg and wife] as regards their proper holdings, same having been adversely affected by a decision of a local court which allowed owners of lot 7 to include as part of that lot all land lying east of the meridional center line of the section." Thus it plainly appears that after a circuit court of the state of Wisconsin, a court of competent and all comprehensive original jurisdiction, had adjudicated the rights of Ilg as between him and the plaintiff herein, the land department of the United States government, a mere administrative bureau of the government, assumed to render null and void the judgment of that court merely on the application of Ilg, and solely for his benefit. The government could not possibly realize the slightest benefit from a resurvey of the land, as the cost to the government of the resurvey and the entertainment of the proceedings must necessarily far exceed what the government would receive on the reallotment of the land it proposed to take away from the plaintiff and others, held under patents issued pursuant to the original survey. The total receipts of the government on its allotment of the land covered by its survey was only $360.60. Of this $228 was for land it assumed to take from the plaintiff. The land so assumed to be taken constituted almost the whole value of land for which the plaintiff had paid $10,000. The only excusable basis for a resurvey would be to enable the

government to resell the land it might recover by it. But there can be no justification for a resurvey when the government cannot possibly recover enough on resale of the recovered land to pay it for the cost of the resurvey and the necessary proceedings incident to its recovery. If the titles passed by the patents issued on the instant resurvey were held to override the original patents under which the premises covered by the original plat has been held for seventy years, the titles to the greater part of the lake-shore lands in the state are valueless, and thousands of properties may be practically confiscated by the government for the mere purpose of robbing Peter to give the plunder to Paul.

Plaintiff contends that the defendant is estopped by its participation in the proceedings before the land department to object that the allotments made in those proceedings did not convey title. We note that the conclusion of law of the circuit court recites "that . . . by its [defendant's] failure to appear and defend the proceedings in the general land office . . . instituted by Ilg," the plaintiff was entitled to recover the expense to plaintiff of the latter proceedings. We are unable to find in the record, from any references thereto furnished by counsel, that the recital of the circuit court above stated is not a correct statement of fact. In this situation we shall take the recital of the circuit court as showing that the defendant is not estopped as claimed by the plaintiff. Besides one is never estopped to objecting to a determination made by an administrative body, or by a court for that matter, that the body or court had no jurisdiction to make. The land department had no jurisdiction to declare the original patent void or to decide the judicial question of what land is included in that patent.

It should perhaps be further stated that the plaintiff claimed that at the time its deed from the defendant was executed the defendant represented that the land conveyed extended to the lake; that plaintiff relied on this representation, and that be-

cause of the representation plaintiff is entitled to damages; that the parties both mistakenly understood and believed that the land conveyed comprised all the land bounded by the lines and lake as above stated, and that because of such mutual mistake the deed should be reformed to expressly contain a description so bounded. But we are here confronted with the facts that the representation was true, and as the deed conveyed the land lying within the boundaries stated there was no need to reform it.

As the defendant's covenant of warranty does not cover the assumed taking of the part of the land conveyed pursuant to the governmental allotment upon the resurvey and re-platting of the land bordering on the lake, it follows that the plaintiff can recover no damages by reason thereof. There is only left for consideration whether it is entitled to recover the costs and attorney's fees paid by the plaintiff incurred in the prosecution of the Ilg ejectment suit. The court found that Ilg was in possession of a part of the land conveyed when the deed to plaintiff was executed. The defendant urges that that finding is not sustained by the evidence, but we consider that it cannot be held to be "contrary to the great weight and clear preponderance of the evidence," and therefore must be upheld. The suit against Ilg was brought in vindication of the title to lot 7 as it existed at the time the deed was executed. There seems no doubt that costs and attorney's fees incurred by a grantee in prosecuting an ejectment suit against one in possession of the land when it was conveyed may be recovered when the title by which the defendant holds is adjudged superior to that conveyed by plaintiff's grantor. See note in 61 A. L. R. 167, and cases there cited to note 28. But the defendant contends that Ilg was a mere trespasser and that the covenant of warranty does not cover tortious claims but only lawful claims. As a general rule this is correct. See 14 Am. Jur. p. 537, § 78. But it was squarely held in *Lasswell Land & Lbr. Co. v. Langdon* (Mo. App.), 204 S. W. 812, 813, that

costs and expenses incurred in ejecting a squatter in possession at the time a warranty deed is executed may be recovered by a grantee upon the covenant of seisin. It is there held that such covenant embraces "both possession and title," and the covenant is breached "if the covenantor has not the possession, the right of possession, and the right of legal title." The case of *Coleman v. Clark,* 80 Mo. App. 339, is cited as and is to the same effect. That case cites *Fitzhugh v. Croghan,* 2 J. J. Marshall, 429 (Ky.), 19 Am. Dec. 139, and 3 Washburn, Real Property (5th ed.), *657; *Id.* (6th ed.), § 2382, in its support. The *Fitzhugh Case, supra,* holds, par. 1, syllabus, that a covenant of seisin is broken "if the covenantor have not the possession, the right of possession, and the right or legal title." In Washburn it is stated that "the authorities seem to be uniform . . . that if the grantor has no possession of land . . . where he undertakes to convey it by deed and enters into a covenant of seisin therein . . . this covenant is broken at once." One can wade in the sea of adjudicated cases in order to discover what is meant by the word "seisin" until he is totally submerged and lost. But it seems clear, as matter of common sense, that a covenant of seisin implies that the covenantor is in possession of the land conveyed and all of it, and that if anyone is actually in possession claiming adversely to the covenantor, the covenant of seisin is broken, no matter by what right he so claims, and no matter whether his claim is lawful or unlawful, and in any such case the grantee is as much entitled to recover the cost and expense of ejecting him as he would be entitled to those items in unsuccessfully defending his title if he were himself sued in ejectment. In either case he is endeavoring to vindicate his rights under his warranty. If in its suit the adverse claimant, Ilg, had prevailed the plaintiff would be entitled to his costs and attorney's fees herein, under nearly all of the adjudicated cases. 14 Am. Jur. p. 574, § 141. It would seem strange indeed if it could recover them if it had failed in that suit, but could not recover them if it prevailed. We consider that

the plaintiff is entitled to recover the expense incurred in ejecting Ilg, including reasonable attorney's fees.

The findings of the court or the judgment do not so separate, or at least so designate, the amount of the expense included therein attributable to the Ilg suit in circuit court that we can ascertain that amount with certainty. We cannot therefore modify the judgment and affirm it as modified. The judgment must therefore be reversed with direction to the circuit court to fix that amount and enter judgment for it with interest thereon.

*By the Court.*—The judgment of the circuit court is reversed, and cause remanded with directions for further proceedings as indicated in the opinion.

FRITZ, J., dissents.

A motion for a rehearing was denied, with $25 costs, on April 15, 1941.