SCHULTZ and wife, Respondents, v. WINTHER and others, Appellants.*

*February 5—March 8, 1960.*

* Motion for rehearing denied, with $25 costs, on May 3, 1960.

4

For the appellants there was a brief by *Robert D. Martinson,* attorney, and *Immell, Herro, Buehner & DeWitt* of counsel, all of Madison, and oral argument by *Mr. Martinson.*

For the respondents there was a brief by *Edmund H. Drager* of Eagle River, attorney, and *O'Melia & Kaye* of Rhinelander of counsel, and oral argument by *Walter F. Kaye.*

FAIRCHILD, J. Upon appeal, counsel for plaintiffs Schultz argue that the southerly portion of the section line shown on Exhibit 3 (BE) is not the true section line established by the 1863 survey; that a straight line run by the county surveyor Walsh in 1925 (approximately ABD) is the true section line; that the resurvey in 1953 improperly altered the section line, and showed parcels 1 and 2 as part of section 23 when they are truly part of section 22. If this argument were accepted, Mr. and Mrs. Schultz would then have title to parcels 1 and 2 by virtue of their title to lot 7, section 22, and the issues considered by the circuit court would be for the most part irrelevant.

There are several difficulties with the argument now made: (1) It is raised for the first time on appeal. (2) It is inconsistent with the Schultz complaint. There they alleged that parcels 1 and 2 lie in section 23, thus accepting ABE as the true section line. (3) Exhibit 3, the validity of which plaintiffs now attack, was offered by them as part of their case and no plat of either section based upon the 1863 survey is in evidence. (4) The testimony that Walsh was attempting to follow the 1863 section line was admitted for a limited and different purpose, and falls short of establishing that the Walsh line is the same as the section line of the 1863 survey.

Harry Nelson testified that he assisted Walsh in surveying section 22 in 1925; that Walsh located the northeast corner of section 22 and ran a line south 14°, 20′ west from the corner to Sunset lake. At the shore he placed a monument at point D. Nelson testified that according to the notes of the surveyor Daugherty in 1863, the section line was straight, while the section line shown on the resurvey was broken at the quarter corner. The bearings and distances from the northeast corner of section 22 to the shore of the lake were as follows, according to an exhibit prepared by Nelson:

```
In 1863 (Daugherty)....S  7°, 45'W......4118.40
   1925 (Walsh    )....S 14°, 20'W......3564
   1953 (Resurvey )....S 17°,  7'W
                          (north of quarter
                                corner)......2261.16
                       S 28°, 37'W
                          (south of quarter
                                corner)......1477.08
```

Nelson did not explain the difference of almost seven degrees between the bearings of the lines run in 1863 and 1925 except to say, "One thing is that north changes from year to year. They say it changes one degree in about twenty-five years, and it swings back and forth and doesn't go always one way. . . . and he [Walsh] possibly figured that that was the correct line to run on." The court then questioned further on the matter, but the record shows only that a discussion was had off the record. No explanation was made on the record of the fact that the distance from the section corner to the lake shore as determined by Daugherty was some 400 to 500 feet longer than as determined by the government resurvey and Walsh.

When Nelson's testimony was offered, defendants objected on the ground that it was an attempt to vary Exhibit 3. It was received solely for the purpose of the plaintiffs' attempt to establish adverse possession up to the Walsh line, and for the purpose of explaining the location of point D. Apparently plaintiffs felt that they could show that the Walsh line had been recognized by the parties as the true boundary, and that they had adverse possession up to it. We could not affirm the judgment upon the basis of the argument now advanced by plaintiffs, and at most could order a further trial under sec. 251.09, Stats. Under the circumstances, however, we have concluded not to exercise that discretionary power, and to limit our consideration to the issues raised by the pleadings and considered by the circuit court.

*Parcel 1.* The issue as to parcel 1 is whether the 1863 meander line or the lake shore is to be treated as the boundary of lot 3 conveyed by United States patent in 1872. If the 1863 meander line be treated as the boundary, parcel 1 was not conveyed by the 1872 patent, and the plaintiffs Schultz acquired title from the United States by the 1956 patent conveying lot 11. If, on the other hand, the shore of the lake is the boundary of lot 3, parcel 1 was included in the land conveyed by the 1872 patent.

"The general rule is that meander lines are not run as boundaries, but to define the sinuosities of the banks of the stream or other body of water, and as a means of ascertaining the quantity of land embraced in the survey, the stream, or other body of water, and not the meander line as actually run on the ground, being the boundary." Manual of Surveying Instructions (1947), Bureau of Land Management, p. 231, sec. 226; Clark, Surveying and Boundaries (3d ed.), p. 257, sec. 239; 1 Patton, Titles (2d ed.), p. 297, sec. 117; *Railroad Co. v. Schurmeir* (1868), 74 U. S. 272, 286, 19 L. Ed. 74.

The general rule is subject to exceptions. Circumstances may show that what appears to be a meander line rather than the shore of a body of water some distance away was intended as a boundary. The area of land between the meander line and the actual shore has been considered a circumstance bearing upon the question of intent.

"But they no less certainly establish the principle that facts and circumstances may be examined and if they affirmatively disclose an intention to limit the grant to actual traverse lines these must be treated as definite boundaries. It does not necessarily follow from the presence of meanders that a fractional section borders a body of water and that a patent thereto confers riparian rights." *Producers Oil Co. v. Hansen* (1915), 238 U. S. 325, 339, 35 Sup. Ct. 755, 59 L. Ed. 1330.

Another approach was followed in *Jeems Bayou Club v. United States* (1923), 260 U. S. 561, 43 Sup. Ct. 205, 67 L. Ed. 402. That case involved a plat which showed the patented lot bordered by a lake and having the form of a small peninsula extending into the water and connected by a narrow neck with the mainland. Evidence showed, however, that no peninsula existed, and a later survey showed that a large body of well-timbered upland of more than 500 acres in extent lay between the supposititious peninsula and the shore line of the lake in almost every direction. The actual shore line of the lake was from a few feet to three quarters of a mile distant from the outside boundaries of the patented land as shown on the plat. The patented land as shown on the plat contained about 48 acres. It was decided that the land conveyed by the patent was confined to the boundaries shown on the plat, and the court said (p. 563):

". . . but the facts demonstrate that no survey of the large, compact body of land which includes the tract in controversy, was ever made. The circumstances, as well as the extent and character of the lands, necessitate the conclusion that the omission was of deliberate purpose or the result of such gross and palpable error as to constitute in effect a fraud upon the government."

A considerable deviation of the 1863 meander line from the shore of Sunset lake must be conceded. The problem is to determine whether the deviation is so great, or of such character as to constitute "gross error."

The bureau of land management takes the position that in general, at least, the degree of the error rather than its motivation or source is important.

"It should be understood that it is objectionable in principle to amend a plat in any of these cases except upon the showing of large and unwarranted discrepancies, or by

demonstration of equitable title in the government, as otherwise the making of the corrective survey is frequently at the hazard of interference with private rights; and it should be understood that no proof is required to show the whys and wherefores of an erroneous meander line, but rather that the line as run and as represented on the plat and in the field notes is in effect grossly in error. The rule is concisely stated in *John McClellen,* 29 L. D. 514, 521, 522 (1900) : It is not necessary to search for the source of the error. The result is the same whether such error arose from mistake, inadvertence, incompetence, or fraud on the part of the men who made the former survey." Manual of Surveying Instructions (1947), Bureau of Land Management, p. 368, sec. 514.

In *United States v. Lane* (1923), 260 U. S. 662, 43 Sup. Ct. 236, 67 L. Ed. 448, the supreme court of the United States considered the same survey as was involved in the *Jeems Bayou Club Case.* There it appeared that the meander line then before the court approximately conformed to the sinuosities of the shore, sometimes running for short distances inland, and sometimes for short distances into and through the water. Along a portion of the line under consideration, the aggregate of the parcels of land lying outside the meander line was about 70 acres, and the aggregate of the various areas of water within the meander line was about 44 acres. The court declined to find that there was any fraud or palpable mistake. In two other companion cases involving the same survey, the area indicated by the plat was 271 acres, and the acreage between the meander line and the water amounted to 97.64 acres. The court decided that the lake, rather than the meander line, would constitute the boundary, noting certain conditions in the terrain which would have made it difficult and expensive to establish the line precisely at the water's edge. The plat understated the area conveyed by about 26 per cent.

"Considering the circumstances in respect of the character and value of the lands, the wildness and remoteness of the region and the difficulties surrounding the work of the surveyors, the failure to run the lines with more particularity was not unreasonable and we are constrained to agree with the lower court in holding that the waters of the lake and not the traverse line constitute the boundary." *United States v. Lane, supra* (p. 666).

In *Brown v. Dunn* (1908), 135 Wis. 374, 115 N. W. 1097, this court applied the general rule that the lake shore rather than the meander line as shown on the government plat was the boundary. It would appear from that opinion that the tract included within the meander line was slightly in excess of 40 acres. The strip between the meander line and the lake shore was 60 rods or more in width, and the whole parcel contained 145 acres if bounded by the shore. The plat understated the area by something approaching 70 per cent. This court was of the opinion that the facts did not show (p. 378), "either fraud in the survey or so gross a mistake in the location of the lake as to force the conclusion that the United States government did not, . . . intend to convey to its shore, . . ."

It would be difficult to reconcile *Brown v. Dunn, supra,* with a holding in the instant case that there was gross error in the survey, although it is true that there had been no government resurvey in *Brown v. Dunn.*

Two later Wisconsin decisions involved situations where the United States did make a resurvey, presumably upon the administrative determination that there was a gross error in the running of the meander lines. In the first of these, *Brothertown Realty Corp. v. Reedal* (1930), 200 Wis. 465, 227 N. W. 390, it was decided that the original survey line departed so far from the true meander line of the body of water as to leave so large a tract of land unsurveyed as to

clearly indicate that the meander line was in fact never run. The court mentioned the appearance of two long, straight segments of the meander line in question as indicating that there had been no attempt to follow the sinuosities of the shore, even approximately. The land between the shore and the meander line amounted to 103.28 acres. The greatest deviation of the meander line from the shore was 180 rods. Lot 4, the particular parcel in issue, would include 26.20 acres if the meander line were the boundary, and 45.57 if the shore were the boundary. In the latter case, the plat would have understated the area by 42 per cent. Lots 2, 3, and 4, which were all the lots abutting the challenged portion of the meander line, had an area shown by the plat totaling 87.29 acres, and would have contained 190.57 acres if the shore were the boundary. In that event, the plat would have understated the total area of the three lots by 54 per cent.

The circuit court evidently relied principally upon the *Brothertown Case,* and determined that the meander line was not actually run in 1863. Exhibit 3 suggests no reason why the 1863 meander line should have been drawn so far from the lake shore. The meander line bears some resemblance to the outline of the portion of the lake shown on Exhibit 3. That suggests the possibility that the meander line could have been run on the ground, but was reflected in the field notes and plat in an improper position as a result of inadvertent error. The record does not contain any information as to the terrain between the lake and the meander line. Whether the terrain provided some reason or excuse for running the line as shown on Exhibit 3 rather than close to the shore cannot be ascertained. The record does not contain a plat of the resurvey of the adjoining section 26, and we do not know the acreage in section 26 which was involved in the same error.

As suggested in the Manual of Surveying Instructions above quoted, however, there seems to be little merit in placing controlling importance upon the explanation for, or source of, an error, and we think that the question of whether the meander line is sufficiently in error so that it should be considered the boundary should be determined in accordance with the amount and proportion of acreage between the meander line and the shore. In setting the proper standard of accuracy, regard should be given to the circumstances surrounding the original survey, and the type and comparative value of the land at that time. See *United States v. Lane, supra* (p. 666). There is nothing in the record to suggest that in 1863 the lake-shore land was any more valuable than the upland; in fact, the upland may have been more valuable by reason of timber on it.

In *Lakelands, Inc., v. Chippewa & Flambeau Improvement Co.* (1941), 237 Wis. 326, 334, 295 N. W. 919, this court commented upon the *Brothertown Case,* and the fact that 103 acres of omitted lands were involved. "That seems to be the low limit." In the case before us, the lands in section 23 lying between the meander line and the lake shore amount to 73.44 acres. The record does not show the percentage by which the acreage shown on the original plat would understate the area of the various lots if bounded by the lake shore, except that in the case of lot 3 it was alleged that the area shown by the plat was 57 acres. If this be true, and the shore be the boundary, lot 3 apparently would contain 78.39 acres, and the plat understate the area by 27 per cent. The correct northern and eastern boundaries of lot 3 are not clearly apparent from Exhibit 3, but it does appear that at the least, the part of lot 3 north of the meander line is almost twice as large as lots 10 and 11 shown by Exhibit 3.

We have examined a number of decisions, including those herein cited, involving early surveys of wild land. In all those where a court has decided that the error in the meander line was sufficient so that the meander line would constitute the boundary, the error has involved a larger acreage than the 73.44 acres in this case. As noted in the *Lakelands* decision, the 103.28 acres considered in the *Brothertown Case* appears to be the smallest area where constructive fraud has been found. In all such cases, the acreage shown on the plat would have been an understatement of the true area by substantially more than one third if the land conveyed had been held to run to the shore as the true boundary. Again, the 42 per cent understatement in the *Brothertown Case* appears to be one of the smallest.

Therefore, while there is no exact formula for determining when error in the running of a meander is to be considered a gross error amounting to a constructive fraud upon the government, we conclude that it will be more in line with the decided cases to hold in this instance that the error was not sufficient to constitute a constructive fraud. In the absence of constructive fraud, the lake shore, rather than the meander line, was the boundary of lot 3 as conveyed by the United States patent in 1872. From this it follows that defendants' title to parcel 1 is superior to plaintiffs' title by virtue of the patent of lot 11 based upon the resurvey.

In determining whether or not to order a resurvey, and in determining to whom patents for the omitted lands should be issued, the bureau of land management makes certain administrative decisions in accordance with standards set forth in the Manual of Surveying Instructions, as well as the applicable statutes. The courts seem not to have accorded to the resurveys the presumption of regularity of official acts and thus place the burden of proof upon the party who relies

upon the original survey. Perhaps the reason is that such a presumption would be in conflict with the presumption of regularity attending the original survey. Or, as stated in *Lakelands* (p. 334), "But the question whether the acreage is so great as to constitute a constructive fraud is a judicial question not determinable by the United States government land department." We have concluded that notwithstanding the administrative determination that the lands along Sunset lake were omitted lands, the burden was upon the plaintiffs to establish that the error in meandering was sufficient so that the general rule should not be applied, rather than upon the defendants to establish that the administrative determinations were incorrect.

*Parcel 2.* Parcel 2 lies within lot 3 as shown on Exhibit 3; hence record title is in defendants. Plaintiffs assert title based on adverse possession for more than twenty years, and the court found in their favor. It is our conclusion that the evidence relied upon by plaintiffs was insufficient to support the finding.

Mr. Schultz's mother acquired title to the material portion of lot 7, section 22, in 1918. She conveyed it to her son in 1927, and he created a joint tenancy with his wife in 1941. He testified that he knew of the section corner established by Walsh on the lake shore (point D); that in 1938, he sold some land in lot 7, 400 feet and more to the west of the parcels here in dispute, and that the surveyor whom he employed to prepare the description used the Walsh monument as a reference point from which the point of beginning for the description of the parcel sold was located; that he knew the location of the Walsh line because he went over it many times "and we always blazed a little marker so we knew because we had no fence or anything." He testified further: "*Q.* Was it a line so that it was visible to anyone that could see where the boundary was? *A.* Not that I kept

it open that way, no. It was when Walsh had the line through there, a tree here and there. Just a little idea where the line was." The only acts of possession of the disputed parcels testified to by Schultz were that he cut wood up to the Walsh line "up until the Second World War" and he "had it posted time and again." He had three or four signs "that is in a ways I would say, maybe 50, 60 feet away from the section line, wherever there was a nice tree that would be suitable." Defendant Winther improved the area east of the Walsh line but did not improve the area to the west of it except that two thirds of a guest cottage owned by Winther was located on parcel 1. It does not appear when the guest cottage was placed there.

On one occasion, about 1950, Winther was using a bull-dozer near the monument placed by Walsh. Schultz noticed that the bulldozer had moved the stone a little, and told Winther he did not want anybody to bother the stones. Winther offered to get together with Schultz if there were any damages, and Schultz said there was no damage.

Schultz testified that he had paid taxes according to an assessment which indicated that 402 feet of lake frontage was included. This frontage would necessarily include the lake frontage of parcel 1.

Robert Kmichik, an employee of defendant Winther, was the only witness for defendant. He testified to various acts of posting and the like indicating that Winther claimed the disputed area, but the trial court did not believe his testimony. Credibility of the witness was a matter for the trial court. Eliminating Kmichik's testimony wherever it was inconsistent with the testimony of Schultz, we nevertheless conclude that the Schultz testimony was too vague to be a basis for a finding that he had adverse possession for more than twenty years. He cut wood on the property up to the Second World War. Schultz did not, however, state when

he began to cut wood. He testified that he posted the property time and again in three or four locations. He did not testify how frequently he renewed the signs, nor when he began posting, nor whether he had continued to the time of the trial. The assessor may have considered that Schultz owned the property; but there was no evidence that defendants knew of this. The conversation with Winther about his accidental interference with the Walsh monument suggests a claim by Schultz and recognition by Winther that the Walsh line was the boundary between them, but the construction (apparently without objection by Schultz) of one of his buildings extending beyond the Walsh line suggests that the parties did not know where the Walsh line was, or did not consider it the boundary.

*By the Court.*—Judgment reversed; cause remanded with instructions to dismiss the complaint, and to grant judgment of ejectment on defendants' counterclaim.