UNITED STATES of America,
Plaintiff,

v.

295.90 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF LEE, STATE OF FLORIDA, and Carl A. Norberg, et al., Defendants.

No. 71-12-Civ-FtM-H.

United States District Court,
M. D. Florida,
Fort Myers Division.

Jan. 3, 1974.

Ronald H. Watson, Asst. U. S. Atty., Tampa, Fla., for plaintiff.

Morris E. White, of Fowler, White, Gillen, Humkey, Kinney & Boggs, James B. McDonough, Jr., of Macfarlane, Ferguson, Allison & Kelly, Leslie Scharf, of Trenam, Simmons, Kemker, Scharf & Barkin, Tampa, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HODGES, District Judge.

This is an eminent domain proceeding instituted by the Government to acquire certain lands on Sanibel Island, Lee County, Florida, to be used as a part of the J. N. "Ding" Darling National Wildlife Refuge.

Portions of the lands being condemned were designated in the Government's Complaint and Declaration of Taking as Tracts 25 and 25–I. These are contiguous parcels comprising, in the aggregate, approximately 33.41 acres. Various parties were identified as owners or potential claimants to those Tracts, and all appeared and filed their claims or answers.[1]

On July 21, 1972, the Government filed a Motion For Title Hearing in advance of the jury trial. Following a study of the motion and the positions of the respective parties, Judge Krentzman entered an order on January 10, 1973, finding that a genuine issue existed concerning the status of title to Tracts 25 and 25–I, and that such issue should be resolved by conducting an evidentiary title hearing prior to the jury trial to be held on the issue of just compensation. Accordingly, the hearing was scheduled before the undersigned in Fort Myers on April 16 and 17, 1973. Each side presented witnesses and documentary evidence, as well as post-hearing briefs; and the Court has since enjoyed the benefit of argument by counsel at a subsequent hearing conducted on December 18, 1973.

Stated as succinctly as possible, the issue presented is whether the Government already owned a major portion of the subject lands prior to the institution of this suit.

■ Originally, of course, title to most of Florida, including the subject property in particular, was ceded to the United States by virtue of the treaty with Spain in 1821 (8 Stat. 252). See, State ex rel. Town of Crescent City v. Holland, 151 Fla. 806, 10 So.2d 577 (1942); 26 Fla.Jur., Public Lands, § 3 (1959). Subsequently, in 1875, pursuant to a contract with the Surveyor General, one Horatio Jenkins undertook to survey a number of townships in what is now the Charlotte Harbor-Lee County area, including Sanibel Island.[2] Jenkins' field notes were used to prepare the official maps or plats of the area as ultimately filed in the General Land Office of the United States, and those plats, in turn, formed the basis of the legal description of the lands in the area as thereafter conveyed by Government patents.

The property involved in this case—Tracts 25 and 25–I—lies within fractional Section 18 of Township 46 South,

---

1. There are a number of such Claimants, but it is unnecessary for purposes of this order to separately identify them or the nature of their several interests. They are collectively represented by the same counsel, and the issue presented is one raised by the Government as to which the several Claimants are united in opposition. Their positions, both factually and legally, are precisely coextensive.

2. As a matter of general orientation, Sanibel Island is an elongated, crescent shaped body of land approximately 12 miles long and 2 to 3 miles wide, running generally from East to West and lying in the Gulf of Mexico approximately 3 miles off shore.

Range 22 East, as surveyed by Jenkins. Section 18 is a fractional section because the Jenkins plat shows a meandered body of water in the section resulting in irregularly shaped parcels of upland designated lots 1 through 7 as follows:

SECTION 18, T. 46 S., R. 22 E.
JENKINS SURVEY, 1875
= WATER

Tracts 25 and 25–I include a portion of (and are otherwise associated with) Government Lot 7 as depicted above. That lot was initially patented and conveyed into private ownership by the United States in 1897, and the Claimants in this suit deraign their title from that patent.

The parties are largely in agreement concerning the factual background recited thus far. The dispute that does exist arises from the fact that substantial discrepancies appear when any attempt is made to apply the Jenkins survey and plat to the land as it actually exists today. Indeed, the evidence is plain that

Jenkins' work has been a source of confusion and uncertainty for many years among surveyors, title attorneys and others working with real estate descriptions on Sanibel Island. Thus, on January 2, 1968, the Bureau of Sport Fisheries and Wildlife of the Department of The Interior entered into a contract with Carl E. Johnson, Inc., a firm of registered land surveyors in Fort Myers, for the purpose of surveying and establishing boundary lines between public and private ownerships in Township 46 South, Range 22 East.[3] The result of the Johnson survey was to form the basis of a deed from the State of Florida to the United States conveying state owned or sovereignty lands and water bottom in that Township as an addition to the refuge. The description of the work as set forth in the contract with Johnson was as follows:

"The work consists of the location, survey, monumentation and marking of continuous boundary lines, separating private lands, *and accretion appurtenant thereto*, from the lands and water bottoms being acquired [from the State], and public lands of the United States now a part of the refuge. . . ." (Emphasis supplied).

Accordingly, when it was ascertained in the field that upland existed where water bottom was shown on the Jenkins' survey and plat (i. e., in areas lying beyond the Jenkins meander line), the Johnson firm allocated or prorated this land as apparent "accretion", one-half to the South ownership and one-half to the North ownership.[4]

The Johnson survey and plat was approved by the Regional Director of the Bureau of Sport Fisheries and Wildlife of the Department of The Interior; and on March 21, 1969, it was also approved and filed as an official plat by the Director of the Trustees of The Internal Improvement Fund of the State of Florida. See Florida Statute 253.031, F.S. A., (1971). Thereafter, on January 30, 1970, the State conveyed its interests in Section 18 to the United States by metes-and-bounds descriptions based upon the Johnson survey; and, in the meantime, private transactions involving property in the area also utilized the Johnson survey for purposes of description.

When this suit was filed the Government further utilized the Johnson survey in delineating the lands being taken, including Tracts 25 and 25–I. Those Tracts were described as that part of Lot 7, Section 18, Township 46 South, Range 22 East, "lying north of the centerline of Sanibel-Captiva Road, and ap-

3. The following passage from Johnson's explanation of his survey (Defendants' Exhibit 2, sheet 2), is indicative of both the duration and the nature of the confusion caused by Jenkins' work:
"The original survey of Township 46 South, Range 22 East on Sanibel Island was executed by Horatio Jenkins, Jr. in 1875. On June 29, 1897, Albert W. Gilchrist, a very competent surveyor who later became Governor of the State of Florida, came to Sanibel Island under a contract with the Government to retrace part of Township 46 South, Ranges 22 and 23 East for the purpose of resurveying Township 46 South, Range 21 East. After 15 days of searching for evidence of the original survey in Township 46 South, Range 22 East, he was forced to the conclusion, as quoted from his notes:
'The retracement had shown that most of the notes were fictitious and the fiction grew greater as I approached the West. I decided the only thing to be done was to accept the notes of the original survey as the standard and to obtain the starting point for the resurvey of Township 46 South, Range 21 East in accordance. To establish the Range Line between Ranges 22 & 23 East, Township 46 South, and thence run the original Field Notes of the meanders of the Gulf of Mexico, Westward for six miles.' Book "B", P. 59."

4. Mr. Lester Bulson, a registered surveyor associated with Carl E. Johnson, Inc., testified without contradiction that this method of allocating or prorating apparent "accretion" was a sound and generally accepted practice among professional surveyors, and that he had previously performed surveys and prepared maps in Sections 18 and 19, following the same practice.

parent accretion thereto, more particularly described as follows" [metes and bounds]. As so described, Tracts 25 and 25–I consist of 33.41 acres, all of which, except for 2.76 acres, was land accreted to Lot 7 by the Johnson survey. That is, 30.65 acres of the land within those Tracts was shown as water bottom by Jenkins, lying beyond his meander line as the apparent boundary of Lot 7. An outline of Tracts 25 and 25–I, superimposed upon Jenkins' survey of Section 18 (as depicted earlier), would roughly appear as follows:

The southern boundary of Tracts 25 and 25–I as shown on the diagram generally coincides with the Sanibel-Captiva Road. That portion to the south of the road, shown as water by Jenkins, was also accreted as land to Lot 7 by Johnson, but still appears as water on this diagram because it is not included in Tracts 25 and 25–I, and is not involved in this case. The triangular tip of Jenkins' Lot 7 protruding into the Tracts is approximately 2.76 acres, and that is the portion conceded by the Government to be owned by the Claimants. The re-

**1306**

mainder of the Tracts, approximately 30.65 acres, is the area in dispute. The Government claims title to that area on the basis of the following theory.

■ It first concedes, as a general rule, that when lands are patented according to an official survey showing meander lines along a body of water, any excess land is apportioned to the patentee and his title is extended to the waters' edge in accordance with the intent of the surveyor in making the shoreline one of the calls of the description. Mitchell v. Smale, 140 U.S. 406, 11 S.Ct. 819, 35 L.Ed. 442 (1891); Producers Oil Co. v. Hanzen, 238 U.S. 325, 35 S.Ct. 755, 59 L.Ed. 1330 (1915). The Government contends, however, that this case is within an exception to that rule; namely, that where a meander line is shown to be a gross error tantamount to fraud because no water ever existed at or near the place indicated, then any land beyond the meander line is to be treated as unsurveyed land, title to which remains in the Government. Lee Wilson & Co. v. United States, 245 U.S. 24, 38 S.Ct. 21, 62 L.Ed. 128 (1917); Jeems Bayou Fishing & Hunting Club v. United States, 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402 (1923). The Claimants join issue and contend, on the other hand, that the facts and circumstances of this case place it within the general rule, not the exception, relying primarily upon United States v. Lane, 260 U.S. 662, 43 S.Ct. 236, 67 L.Ed. 448 (1923), and Internal Improvement Fund of the State of Florida v. Nowak, 401 F.2d 708 (5th Cir. 1968). Resolution of the case largely depends, therefore, upon analysis of these authorities, particularly the relationship between the *Jeems Bayou* and *Lane* decisions. Before embarking upon that analysis, however, some additional observations and findings must be made concerning the facts.

The Government marshaled an impressive array of witnesses and exhibits tending to prove that Tracts 25 and 25–I existed in their present state as upland in 1875 at the time of Jenkins' survey, and that his meander line was and is wholly inexplicable. On their side, the Claimants skillfully endeavored to show a number of possible explanations for the apparent discrepancy, all leading to the conclusion that Section 18 did encompass a body of water or mangrove swamp subject to the ebb and flow of the tide, so that Jenkins' meander line, albeit inaccurate, cannot under all the circumstances be characterized as such a gross and palpable error as to constitute a fraud upon the Government.[5] For its part, the Court is persuaded that the 33.41 acres of land now designated as Tracts 25 and 25–I was upland in 1875 at the time of Jenkins' survey. It was not submerged water bottom or otherwise subject to the ebb and flow of the tide.[6] Indeed, there seems to be no serious dispute as to that conclusion. Rather, the principal disagreement is whether there was *any* significant area of overflowed land or water bottom in Section 18 as a whole. The Government says there was not, contending that the magnitude of Jenkins' error in showing water where good land existed was on the order of 650 acres (viewing the meander lines in adjoining Sections 17, 20 and 21 together with those in Section 18). As to that question, however, the evidence is inconclusive and any precise finding would be purely speculative. It is sufficient to observe that at least some water bottom appears directly north of the subject property in Section 18 even today (aerial photograph, Defendants' Exhibit 6), and much of the remaining terrain in that section, lying beyond Jenkins' meander line, may accurately be described as low-lying areas

5. The evidentiary excursion into the life and times of Horatio Jenkins, as well as the geological history of Sanibel Island, was an intriguing adventure. The Court is in debt to all counsel for the preparation and ability manifested by their efforts at trial.

6. In addition to the testimony and evidence presented, the Court personally viewed and walked upon a portion of the subject land by stipulation of counsel at the conclusion of the hearing.

and mangrove swamp. It should also be noted that the instant dispute is limited in every respect to the 30.65 acres within Tracts 25 and 25–I. No issue exists in this case with regard to any other ownerships in Section 18 or, for that matter, in Sections 17, 20 or 21.[7]

Analysis of the controlling authorities should appropriately begin with examination of the *Jeems Bayou* decision, *supra*. The land involved in that case was situated in Louisiana and had been surveyed by A. W. Warren in 1839. In 1860 a Government patent was issued to an individual conveying the southwest fractional quarter of Section 10, T. 20 N., R. 16 W., containing approximately 48 acres according to the Warren survey. The plat reflected that body of land as a peninsula extending into the waters of Ferry Lake or Jeems Bayou. The land in dispute in the case was some 85.22 contiguous acres lying west and south of the "supposititious" 48 acre peninsula. Indeed, a later survey revealed that the 48 acre peninsula was, in fact, virtually surrounded by 500 acres of well timbered upland extending beyond the boundaries of Section 10 into three adjoining sections. Although the lake or bayou existed, it was some distance away. Significantly, it was found that the Warren field notes yielded no indication whatever of an intention to meander the margin of any body of water, but described the 48 acres of land "by courses and distances." As a consequence, the Court refused to apply the general rule regarding meander lines and the extension of abutting titles to

the waters' edge. Rather, the totality of the circumstances necessitated "the conclusion that the omission was of deliberate purpose, or the result of such gross and palpable error as to constitute in effect a fraud upon the government." (260 U.S. at 564; 43 S.Ct. at 206). The omitted upland was therefore treated as unsurveyed land, not conveyed by the patent. See also, Producers Oil Company v. Hanzen, 238 U.S. 325, 35 S.Ct. 755, 59 L.Ed. 1330 (1915); and Lee Wilson & Co. v. United States, 245 U.S. 24, 38 S.Ct. 21, 62 L.Ed. 128 (1917).

In United States v. Lane, *supra*, consisting of six consolidated cases, the Court again had occasion to consider the Warren survey of 1839 in the Jeems Bayou or Ferry Lake area of Louisiana,[8] and it is worthy of mention that the decision was rendered less than three weeks after the *Jeems Bayou* opinion. Yet, despite the fact that the two cases were decided at substantially the same time and involved the same survey in the same township (even, as to one parcel, in the same section), the Court reached the opposite result by holding in *Lane* that the general rule would be applied, not the exception to the rule as followed in *Jeems Bayou*.

The factual considerations persuading the Court were the smaller proportionate areas being added to the separately owned parcels; the apparent intent of the surveyor to meander the sinuosities of the shore line; and the fact that some margin of error should be anticipated and allowed due to the wild and remote nature of the land with concomi-

---

7. This point was urged by the Claimants in support of their contention that the Government should be estopped from claiming title to any portion of Tracts 25 and 25–I. It is mentioned here, not in the context of a possible estoppel (a question which the Court does not reach), but because the size of the parcel involved *is* important to the ultimate decision. The Court should also mention that it has not placed any importance upon the burden of proof or where it lies, an issue that existed between the parties during the earlier debate as to whether the evidentiary hearing should be conducted. Both sides presented evidence, and the Court's

findings have been made on the basis of a preponderance of *all* the evidence so that, at this juncture, any remaining contention concerning the burden of proof is entirely without substance or is moot, or both.

8. In *Jeems Bayou*, the parcel of land involved was described as being in the SW ¼ of Section 10, Township 20 North, Range 16 West. In *Lane* the various parcels were said to be situated in Sections 3, 10, 13 and 24, respectively, of the same Township and Range. At least one of the *Lane* parcels, therefore, was in the same section as the land involved in *Jeems Bayou*, and the others were only a short distance away.

tant low value in relation to the cost of the survey at the time the work was done. The correct resolution of this case, therefore, requires examination of its facts in light of the three considerations emphasized by *Lane* as the best means of determining whether that decision, or the exception represented by *Jeems Bayou*, should be applied.

■■ The first factor to be weighed is the size of the parcel involved; and the consideration of "size" in this context has three relative aspects (a) the size or area of the parcel as shown by the original survey; (b) the relative size of the "new" area disclosed by the more recent survey; and (c) the size or magnitude of the original surveyor's error measured by the amount of unsurveyed land in the surrounding vicinity as a whole. Taking each of these aspects *seriatim*, the size of Lot 7 as shown by Jenkins was 64.01 acres. The four surveyed parcels first considered in *Lane*, as separate tracts, ranged from 23 acres to 114.80 acres; and the surveyed area in *Jeems Bayou* was 48 acres. As to this aspect of size, no distinguishing characteristic appears. The area added to Jenkins' Lot 7 by the new survey was 30.65 acres, an increment of 21%. The areas added to the first four parcels before the Court in *Lane* were 5.67 acres to the original 26.80 (21%); 12.72 acres to the original 23 (55%); 27.87 acres to the original 155 (18%); and 11.49 acres to the original 114.80 (10%). By contrast, the "new" land in *Jeems Bayou* (85.22 acres) was almost double the size of the tract shown on the original survey (48 acres)—an increment of 179%. This comparison obviously tends to categorize this case with *Lane* while distin-

guishing it from *Jeems Bayou*. The final aspect of the size factor—the magnitude of the omitted lands within the vicinity surrounding the parcel involved —is difficult to rationalize when one reads *Lane* and *Jeems Bayou* together; and the difficulty is compounded when the concept is applied to the facts here. In *Jeems Bayou* the Court recited that the area in immediate dispute was 85.22 acres, but it subsequently observed that this controverted area was only part of more than 500 acres of omitted upland which extended beyond Section 10 and into three adjoining sections. Hence, the Court's conclusion was seemingly influenced not only by the size of the disputed area to be added to the tract involved, but also by the magnitude of the omitted land in the general vicinity. In *Lane,* however, while dealing with at least one parcel in the same section (Section 10), the Court emphasized the relative sizes of the particular tracts and the additions thereto, but never mentioned the aggregate omission of 500 acres in the surrounding area as a whole. It can only be concluded, therefore, insofar as consideration of size is concerned, that the most important test is the size of the particular parcel involved as related to the size of the disputed area added by the more recent survey. See United States v. Zager, 338 F.Supp. 984 (E.D.Wis.1972). The apparent scope of the original surveyor's error within the section or township in general is of secondary importance at best.[9] Furthermore, to the extent that the overall scope of the error should be considered at all, it is difficult to assess its proper weight in this case. The body of water shown by Jenkins is approximately 650 acres, all or most of

---

9. This approach can be criticized on the basis that the end result could be affected by the purely fortuitous circumstance of the division (or lack of division) of the original whole by mesne conveyances since the initial Government patent. As the separate tracts under different ownership become larger in number and smaller in size, the probability increases that *Lane* will apply. On the other hand, if the whole remained intact under one ownership, *Jeems Bayou* might suggest

a different result. The justification is, first, that consideration of size is only one of the factors in the equation and is not determinative standing alone; and, secondly, courts can and should consider only those controversies brought to them for a decision. If the litigation involves one small parcel of land, there would be no end to the mischief created by expanding the scope of the inquiry into other adjoining areas, other titles and, perhaps, other facts.

which, according to the Government's contention, should have been surveyed as upland. And, although the Court has previously found as a fact that the 33.41 acres comprising Tracts 25 and 25–I was upland in 1875, the Court has also concluded that the evidence is insufficient to warrant any precise findings with regard to the nature of the remaining area lying beyond Jenkins' meander line. On balance, therefore, insofar as size is concerned, this case is more akin to *Lane* than to *Jeems Bayou.*

The second factor to be weighed is the intent of the surveyor. Did he intend to meander an existing body of water, or did he wrongly exclude good land by inexplicable "courses and distances . . . [which] necessitate the conclusion that the omission was of deliberate purpose, or the result of such gross and palpable error as to constitute in effect a fraud upon the government"? (*Jeems Bayou*, 260 U.S. at 563–564, 43 S.Ct. at 206). As a standard of reference it should be remembered that the omitted land in *Jeems Bayou* was described by the Court as a "large compact body of upland . . . well timbered with a growth of pine, oak and other trees . . ." (Ibid); and there was nothing in the surveyor's field notes to indicate a body of water as the intended boundary. Conversely, in *Lane,* the general terrain was characterized as wild and remote, and the meander line, at least in some places, fairly conformed to the shoreline of existing water. The evidence in this case (as well as the Court's personal view of the land) compels a finding that the subject area of Sanibel Island was also wild and remote, and there was then, as there is now, at least some open water in Section 18 together with a substantial area of overflowed mangrove swamp. Furthermore, reference to Jenkins' field notes discloses repeated use of the phrase "chop & hack mangroves," and his description of the point of beginning for the meander line was as follows: "Begin at meander corner of Secs. 17, 18, *on North side of channel,* then in Section 18", etc. (Em-

phasis supplied). The result of the survey may be enigmatic, but the intent and purpose of the surveyor is clear so that, once again, the circumstances are more comparable to *Lane* than to *Jeems Bayou.*

The third and final factor to be considered is the nature and value of the land in relation to the other conditions surrounding the making of the disputed survey. Here, as already noted, the area being surveyed was truly wild and remote. Even the upland comprising Tracts 25 and 25–I is today a heavily overgrown thicket of tropical plants, bushes, trees and vines. Traversing it on foot from any given point to another would be a tedious and difficult task at best. Attempting to walk through any of the mangrove areas in Section 18 would be virtually impossible. One of the witnesses testified, for example, that a mile per day would be good progress in making a careful survey of the area in the field, yet Jenkins' surveyed the entire township within a two week period during May, 1875. As the Court aptly said in *Lane* (260 U.S. at 665, 667; 43 S.Ct. at 237–238):

" . . . the lands were of such little value, the locality so wild and remote, and the attendant difficulties so great that the expenditure of energy and money necessary to run the lines with minute regard to the sinuosities of the lake would have been quite out of proportion to the gain."

\* \* \* \* \* \*

"Considering the circumstances . . . the failure to run the lines with more particularity was not unreasonable . . . ."

The Court has thus reached the conclusion that this case should be governed by the general rule as applied in *Lane,* and not by the exception to the rule as followed in *Jeems Bayou.* In weaving its way to this conclusion the Court has found considerable aid and comfort in Internal Improvement Fund of the State of Florida v. Nowak, 401 F.2d 708 (5th Cir. 1968). The Court of Appeals there resolved a similar problem by taking the

same approach and reaching the same result. A point-by-point, comparative analysis of the relevant decisions and the facts of this case leads inevitably in that direction.

It must be recognized, however, that there is one distinguishing characteristic about the present case which prevents the "general rule" from fitting the circumstances quite as neatly and precisely as one would like. That distinction lies in the fact, as mentioned earlier, that the new and more accurate survey by Johnson in 1968–1969 does not simply extend the apparent boundary of Lot 7 to the edge of any existing body of water in accordance with the presumed intent of the original surveyor as was done, for example, in both *Lane* and *Nowak*. Instead, the excess upland was apportioned equally to the abutting owners as apparent accretion. It might be suggested, therefore, that this feature alone is sufficient to require application of the exception to the rule as in *Jeems Bayou;* and, to be sure, the theory or rationale of the exception lends some weight to that position. In Lee Wilson & Co. v. United States, 245 U.S. 24, 29, 38 S.Ct. 21, 22, 62 L.Ed. 128 (1917), the Court first articulated the general rule, and then explained the exception as follows:

> "But where upon the assumption of the existence of a body of water or lake a meander line is through fraud or error mistakenly run because there is no such body of water, riparian rights do not attach because in the nature of things the condition upon which they depend does not exist . . . ."

■ In short, despite the favorable comparison of this case with *Lane* on each of the three factual considerations emphasized as controlling in that decision, the ultimate question arises as to whether the general rule can ever be applied in the absence of proof that a clearly defined body of water exists, or previously existed, thereby giving rise to the riparian rights upon which the rule depends. The question poses some difficulty in view of the Court's previous conclusion that it would be pure speculation to attempt any determination at this late date concerning the precise nature, scope and configuration of the submerged lands in Section 18 when Jenkins arrived there in 1875. But there is another feature that sets this case apart. Unlike *Jeems Bayou,* or even *Lane* and *Nowak,* the issue here does not concern the location of a lake or river, or other familiar and definitive body of inland water. Instead, the case involves a low lying offshore island, sloping on the mainland side into mangrove swamp, and subject always to the vagaries of sea and tide to say nothing of the havoc of hurricanes and modern changes wrought by dikes and drainage.[10] This is not to suggest that Jenkins' meander was substantially accurate, for obviously it was not; but it is sufficient to preclude any finding of such gross and palpable error as to be tantamount to fraud, and that is the key. While the general rule is a corollary of riparian rights, it is equally true that the exception depends upon gross error or fraud to the degree of a finding that "no body of water exists or existed at or near the place indicated." (*Jeems Bayou,* 260 U. S. at 564, 43 S.Ct. at 206). At least some water bottom existed (and still exists) in Section 18, and the peculiar circumstances are such that no reliable yardstick is available by which to measure the full extent of Jenkins' error. It follows under those circumstances that application of the general rule of *Lane,* including a proration of the excess land to the abutting upland owners in keeping with standard surveying practice, is neither an aberration nor an unwarranted extension of that rule.

The exception to the rule, after all, is just that—an exception. Strong policy .

---

10. The Claimants established that no less than seventeen hurricanes have passed over or near the area since 1830; and, in recent years, the Government has constructed an extensive dike to the north of the subject property as an improvement to the refuge.

considerations are aligned against its application except in the most egregious circumstances. Century old surveys are bound to be inaccurate in some respects, and ". . . the immense importance of stability of titles dependent upon [Government patents] demand that suit to cancel them should be sustained only by proof which produces conviction." Wright-Blodgett Co. v. United States, 236 U.S. 397, 403, 35 S.Ct. 339, 341, 59 L.Ed. 637 (1915).

The concluding lines of *Nowak* are particularly apropos (401 F.2d at 718):

"Each case must turn on its own facts and must be considered in light of the general rule and the exception to that rule. We do not, as appellants have suggested that we might, hold that any reference on a plat to a body of water will mean as a matter of law that the water is the boundary."

It is the conclusion and judgment of the Court that, at the time of the Complaint and Declaration of Taking filed in this cause, the Claimants were the owners of Tracts 25 and 25-I as their interests may appear, and they are entitled to an award of just compensation to be determined according to law.